DECISION AND JOURNAL ENTRY
{¶ 1} Appellant, Sherry Patterson, appeals from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated her parental rights and placed her minor child in the permanent custody of Summit County Children Services Board ("CSB"). This Court affirms.
 I. {¶ 2} Patterson is the natural mother of J.J., born March 14, 2000. J.J.'s father is not a party to this appeal. CSB became involved with this family after J.J. was found unattended on a fourth-floor balcony while his father was apparently sleeping inside the apartment. At that time, Patterson was staying with her father in the Columbus area recovering from the birth of another child, whom she had given up for adoption. Patterson returned to this area briefly but resided primarily with her father for the next few months. During February 2003, Patterson moved to Indiana to live with a man whom she later married.
 {¶ 3} CSB eventually moved for permanent custody of J.J. and the hearing commenced on May 25, 2004. Evidence at the hearing focused, in large part, on Patterson's lack of contact with J.J. throughout the 21 months that he had lived outside the home. The trial court found that J.J. had been in the temporary custody of CSB for more than 12 of the prior 22 months and that permanent custody was in his best interest. Consequently, the trial court granted the agency's motion and terminated Patterson's parental rights. Patterson appeals and raises one assignment of error.
 II. ASSIGNMENT OF ERROR
"The Juvenile Court erred in granting [CSB'S] Motion for Permanent Custody of [J.J.] where such action was not in the best interest of the child and was against the manifest weight of the evidence."
 {¶ 4} Patterson contends that the trial court erred in granting permanent custody to CSB because its best interest finding was against the weight of the evidence. Before a juvenile court can terminate parental rights and award to a proper moving agency permanent custody of a child, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned, orphaned, has been in the temporary custody of the agency for at least 12 months of the prior 22 months, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C.2151.414(D). See R.C. 2151.414(B)(1) and 2151.414(B)(2); see, also, In re William S. (1996), 75 Ohio St.3d 95, 99.
 {¶ 5} The trial court found that the first prong of the test was satisfied because J.J. had been in the temporary custody of CSB for at least 12 of the prior 22 months and Patterson does not contest that finding. Patterson challenges only the best interest prong of the permanent custody test.
 {¶ 6} When determining whether a grant of permanent custody is in the child's best interest, the juvenile court must consider the following factors:
"(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
"(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
"(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999; [and]
"(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency[.]" R.C.2151.414(D)(1)-(4).[1]
 {¶ 7} When reviewing the weight of the evidence, this Court applies the same test in civil cases as it does in criminal cases. Tewarson v. Simon (2001), 141 Ohio App.3d 103, 115. "The [reviewing] court * * * weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered." Id., citing State v. Thompkins (1997),78 Ohio St.3d 380, 387, quoting State v. Martin (1983),20 Ohio App.3d 172, 175.
 {¶ 8} Patterson focuses her argument on whether she had complied with the requirements of her case plan. Evidence of case plan compliance, however, is usually relevant to the trial court's best interest determination but is not dispositive of it. See, e.g., In re A.A., 9th Dist. No. 22196, 2004-Ohio-5955, ¶9. Instead, the primary focus of the trial court's best interest determination is on the specific best interest factors listed above.
 {¶ 9} The evidence of Patterson's interaction and interrelationship with J.J. weighs heavily in favor of permanent custody to the agency. As this Court has repeatedly stressed, the first best interest factor is "highly significant" and "focuses on a critical component of the permanent custody test: whether there is a family relationship that should be preserved." In reSmith (June 2, 2002), 9th Dist. No. 20711; In re C.M., 9th Dist. No. 21372, 2003-Ohio-5040, at ¶ 11. The evidence before the trial court demonstrated that while J.J. was in CSB custody, Patterson chose to reside outside the Summit County area to pursue her own interests and did not make much effort to maintain a family relationship with J.J.
 {¶ 10} While J.J. was placed outside the home, he lived with two different foster families. During the first five months that J.J. was placed with the first foster family, Patterson interacted with J.J. through supervised visitation that was scheduled weekly. Although the foster mother described Patterson's attendance at visitation during that period as being "pretty consistent," the caseworker testified that Patterson actually missed more than one third of scheduled visits. When Patterson missed visits, she did not contact the foster parents or anyone at CSB, so J.J. sat waiting for his mother and was disappointed when she did not show up. The foster mother described J.J. as being "crushed" when Patterson did not show for the visit scheduled during Valentine's week of 2003. At that time, Patterson had not missed a visit for over one month. The foster mother explained that she and J.J. had baked handprint cookies and that she had allowed him to get excited about the visit because she "never dreamed that she wouldn't come."
 {¶ 11} From that missed Valentine's visit through July, 2003, Patterson had no contact with J.J. whatsoever. She did not attend visits, did not call him, and did not send him letters or cards. The many visits that Patterson missed throughout the case plan period included the Valentine's week visit described above, as well as visits scheduled for Christmas, Easter, and J.J.'s birthday.
 {¶ 12} When Patterson resumed visitation during August 2003, she again failed to do so on a consistent basis. According to the current foster mother, Patterson missed more than one third of the scheduled visits and never called to indicate that she would be missing the visits. Of the visits that Patterson did attend, she was 30 minutes to one hour late for five of them. The foster mother explained that, because she knew Patterson was coming from Indiana, she and J.J. usually waited much longer than the fifteen minutes CSB required before concluding that Patterson would not be coming. Consequently, on five different occasions, J.J. and the foster mother sat and waited for over an hour before concluding that Patterson was not coming.
 {¶ 13} Even when Patterson did have contact with J.J., it was not very meaningful. During the visits Patterson attended, she did not interact much with J.J. but simply watched him. Patterson's reaction to J.J. was described by one witness as being very flat. Another witness explained that Patterson did not seem to want to have conversation with J.J., nor did she ask him or others about his life, and she did not seem to be very interested in him. At the hearing, Patterson was asked to identify J.J.'s favorite food and favorite television show but she could not. She merely described him as a normal three-year-old when, in fact, he was four years old by that time.
 {¶ 14} After the fact, at the permanent custody hearing, Patterson offered several excuses for her failure to maintain contact with J.J., including that she did not have transportation. During the five-month period that she failed to have any contact with J.J., however, Patterson never communicated with CSB or the foster parents to either explain her absences or ask for help getting to the visits. It is also significant that it was Patterson who created the transportation problem by choosing to move out of state to pursue her own interests while her child was in the custody of CSB. See In re T.S., 9th Dist. Nos. 21743 and 21740, 2004-Ohio-32, at ¶ 14. Patterson's testimony about why she had moved from her father's home in the Columbus area merely demonstrated how she puts her own needs ahead of those of J.J. She explained that her father became angry with her because she had earned some money working for him but, rather than using the money to obtain her GED as her father had intended, she used the money to visit her thenboyfriend in Indiana. She later moved to Indiana, married the boyfriend and started a new family with him.
 {¶ 15} Throughout the 21 months that J.J. lived away from her, Patterson made no attempts to communicate with him or his foster parents via telephone or mail. Although Patterson offered the excuse that she did not have the foster parents' addresses or phone numbers, she later conceded that the caseworker had told her to get the information directly from the foster parents at the visits but she never did that. Patterson further testified that she communicated with others via electronic mail because it was inexpensive but she apparently never explored the possibility of communicating with J.J. or the foster parents in the same manner.
 {¶ 16} The evidence at the hearing demonstrated that J.J.'s interaction with his foster mother, on the other hand, is very loving. He has a consistent routine with the foster mother and is doing well there. The foster mother would like to adopt J.J.
 {¶ 17} Because J.J. was only four years old at the time of the hearing, the guardian ad litem spoke on his behalf. She testified that J.J. had expressed to her that he wanted to stay with his foster mother. She explained that J.J. had a loving, structured, and stable environment with his foster mother while the relationship with Patterson was not very strong. The guardian ad litem recommended that J.J. be placed in the permanent custody of CSB.
 {¶ 18} J.J.'s custodial history included a lengthy period away from his mother. J.J. was four years old at the time of the hearing and had spent almost half of his life living away from his mother. As discussed above, Patterson moved first to Columbus and then to Indiana to satisfy her own needs and failed to have the level of regular contact with J.J. that was essential to maintain a family relationship.
 {¶ 19} During that time, J.J. had developed a strong bond with his current foster mother and was doing well away from his mother. When J.J. arrived at the home of his first foster parents, he was dirty and was wearing shoes and clothes that did not fit properly. He barely spoke at all and it was very difficult to communicate with him. The two foster families have worked with J.J. and, according to his preschool evaluation, he was at or above where he should be developmentally.
 {¶ 20} At the time of the permanent custody hearing, J.J. had spent almost half of his life in foster care and was in need of a permanent placement. His mother did not appear to have the desire or the ability to care for him on a regular basis and there were no suitable relative placements available. J.J. was doing well with his foster mother and she indicated a desire to adopt him. Consequently, the trial court reasonably concluded that J.J. needed a legally secure permanent placement and that such a placement could not be achieved without granting permanent custody to CSB.
 {¶ 21} Given the evidence before the trial court, it did not lose its way in concluding that permanent custody to CSB was in J.J.'s best interest. The assignment of error is overruled.
 III. {¶ 22} The assignment of error is overruled and the judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to appellant.
Exceptions.
Slaby, J., Batchelder, J., concur
[1] The factor set forth in R.C. 2151.414(D)(5) is not relevant in this case.